UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISTAN KASINGER,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>Defendant. | No. 1:17-cv-01254-GSA<br><br><br>**ORDER DIRECTING ENTRY OF<br>JUDGMENT IN FAVOR OF<br>COMMISSIONER OF SOCIAL SECURITY<br>AND AGAINST PLAINTIFF** |

I.   **Introduction**

Plaintiff Tristan Kasinger ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for

disability insurance benefits pursuant to Title II and Supplementary Security Income ("SSI")

pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the

parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin,

United States Magistrate Judge.[1]  *See* Docs. 16, 17 and 18.  Having reviewed the record as a

whole, the Court finds that the ALJ's decision is supported by substantial evidence. Accordingly,

Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 10 and 11.

## II.     Procedural Background

On February 19, 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income alleging disability beginning December 31, 2010. AR 17. The Commissioner denied both applications initially on December 4, 2012. AR 17. On January 9, 2013, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 17.

Administrative Law Judge Keith Dietterle presided over an administrative hearing on October 22, 2013. AR 29-50. Plaintiff, represented by counsel, appeared and testified. AR 29. An impartial vocational expert Alan Ey (the "VE") also appeared and testified. AR 29. Following the hearing Plaintiff submitted additional medical records, which the ALJ considered in making the decision. AR 17.

On October 29, 2013, the ALJ denied Plaintiff's application. AR 17-25. The Appeals Council denied review on April 10, 2015. AR 1-3.

On June 2, 2015, Plaintiff filed a complaint in the U.S. District Court for the Central District of California. AR 355-57. On January 27, 2016, the Court reversed in part the Commissioner's decision and ordered a sentence four remand for further proceedings. *Kasinger v. Colvin*, 2016 WL 344467 (C.D. Cal. Jan. 27, 2016) (No. CV 15-4140-E) (included in the record as AR 392-405).

On June 15, 2015, Plaintiff again filed applications for disability insurance benefits and supplemental security income.

On March 10, 2016, the Appeals Council vacated the remanded 2013 decision, remanded the case to an administrative law judge for further proceedings, and ordered the administrative law judge to consolidate the 2012 and 2015 applications. AR 421-22.

On September 7, 2016, Administrative Law Judge Nancy Lisewski presided over the administrative hearing on remand. AR 324-333. Plaintiff, represented by counsel, appeared and testified. AR 324. An impartial vocational expert Linda M. Ferra (the "VE") also appeared and testified. AR 303, 324.

In a hearing decision dated September 30, 2016, the ALJ consolidated the two pending actions and determined that Plaintiff had not been disabled since December 31, 2010. AR 303-

11.  On August 1, 2017, the Appeals Council denied review.  AR 293-96.  On September 18, 2017, Plaintiff filed a timely complaint seeking this Court's review.  Doc. 1.

### III.    Factual Background

#### A.    Plaintiff's Testimony

##### 1.    2013 Hearing

Plaintiff (born May 8, 1989) was last employed in December 2010, working as a telephone operator for Disney Parks.  AR 33-34.  His employer fired him because he was missing too many days due to illness.  AR 35.  He previously worked as a Disneyland guide, in a Disneyland kitchen, as a theatre lighting technician, and at California Pizza Kitchen, Starbucks, and McDonalds.  AR 34.

Plaintiff suffered from frequent and severe migraines and spasticity of his muscles that caused him to fall.  AR 35.  He always used a cane to steady himself.  AR 36.  He could do little around the house other than fold the laundry.  AR 40.  Although he had struggled with depression, he was not depressed very often.  AR 43.  Since he had become ill Plaintiff had gained about twenty pounds due to inactivity.  AR 44.

Plaintiff occasionally attended yoga classes because his doctor had recommended the stretch of yoga as an antidote to Plaintiff's pain and spasticity.  AR 44.  Plaintiff could participate in the easy exercises in the first half of the class, but did not participate as the positions became more difficult in the second half.  AR 44.

Unless he had a migraine, Plaintiff got up in the morning and dressed.  AR 42.  After his wife left for work he returned to bed for a few hours.  AR 43.  Plaintiff spent his days resting and napping, usually in a recliner.  AR 40.  He watched television or listened to audiobooks.  AR 44.  He spent about one-half hour daily checking his e-mail and Facebook.  AR 43.  Somedays he left the house with his mother to shop or eat out for an hour or so.  AR 43.  He needed to rest about two hours after he had such an outing.  AR 43.  He generally went to bed between 9:00 and 10:00 p.m., but was awakened by muscle spasms several hours later.  AR 40.

///

Plaintiff had completed high school and some college.  AR 33.  He hoped to attend junior

college and obtain an at-home internet job. AR 44. Although he had a driver's license, he did not drive since his doctors told him driving would be unsafe. AR 41. Because he had bad days on which he could not work for about a third of each month, Plaintiff doubted that any employer would hire him. AR 45.

In a pain questionnaire dated May 4, 2012, Plaintiff described his pain as aching and piercing, and not localized, that is, present in multiple locations at the same time. AR 181-83. The pain occurred five or six times daily and lasted for about fifteen minutes at a time. AR 181. Physical activity aggravated the pain. AR 181. A prescription medication Ketorolac (Toradol) did not fully relieve the pain, but took the edge off within thirty minutes. AR 181.

Plaintiff's regular activities included grocery shopping, dog walking, cleaning dishes, light household cleaning, watching television, reading, and going to Disneyland with his wife. AR 182-83. He could run errands, such as going to the post office or grocery store without assistance. AR 183. Plaintiff was no longer able to engage in regular exercise, heavy household cleaning, swimming, or standing for long periods of time. AR 182. He estimated that he was able to walk one-half mile and stand for twenty minutes. AR 183.

### 2. 2016 Hearing

Plaintiff was in a wheelchair at the second administrative hearing. AR 327. He had begun using the chair three years earlier when his leg pain worsened. AR 327-28.

His daily routine had also changed. Plaintiff slept until about 10:00 a.m. AR 328. If his symptoms were not flaring up he would get up, do the dishes and care for his pets before sitting or lying down due to pain and fatigue. AR 328. The remainder of the day was spent lying down or sitting on the sofa or a chair until retiring at 10:00 p.m. AR 328. When his symptoms were in flare-up, he took Tylenol with codeine and remained in bed except to use the bathroom. AR 328. His wife or roommate would stay home on those days to care for Plaintiff by providing food and helping him to the bathroom. AR 328. Plaintiff's symptoms flared up on about half of the days. AR 329.

///

### B. Medical Treatment

4

1    Neurologist and psychiatrist Wei Mi, M.D., examined Plaintiff on April 8 and June 15,

2    2011.  AR 207-12.  The April examination revealed no abnormal results.  Dr. Mi diagnosed

3    fibromyalgia and depression.  The doctor reported that Plaintiff had experienced a major setback

4    when he stopped taking Savella due to cost, and prescribed Savella[2] and Cyclobenzaprine.[3]  At

5    the June appointment, Plaintiff felt better but reported slight nausea from the Savella, and anxiety

6    attacks once or twice a week.  The examination was again normal.  Dr. Mi added a prescription of

7    Lexapro to address Plaintiff's continuing depression.

8    On March 23, 2011, Plaintiff consulted family practitioner Stephen Helper, M.D.,

9    complaining of multiple neurologic symptoms.  AR 225.  Dr. Helper referred Plaintiff to

10    neurologist Richard Alexan, M.D., who examined Plaintiff on March 28, 2011.  AR 225, 228-30.

11    Dr. Alexan's examination and EEG study were negative.  AR 228-31.  The doctor wrote:

12    
> This patient has multiple symptoms including trouble with memory,
> trouble with balance, and trouble with mentation.  The patient also
> complains of headaches, muscle pain, myalgia, joint pain, and
> mood disorder.  The exact cause remains unclear.  However, I
> highly suspect that this patient has fibromyalgia with or without
> somatoform disorder.  An underlying multiple sclerosis should be
> excluded.  There is no evidence of neuromuscular disease since his
> muscle strength, sensory examination, and reflexes are all within
> normal range.

17    AR 229.[4]

18    Dr. Alexan also diagnosed depression and recommended a prescription of Lyrica or

19    Cymbalta.  AR 229.

20    ///

21    A brain MRI performed on March 31, 2011, identified no acute or gross structural

22    

---

23    [2] Savella (milnacipran HCl) is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) prescribed to
manage fibromyalgia.  www.webmd.com/fibromyalgia/guide/aavella-for-fibromyalgia-treatment#1 (accessed
December 13, 2018).

24    [3] Cyclobenzaprine (Flexeril) is a skeletal muscle relaxant prescribed to relax muscles and relieve pain and discomfort
caused by strains, sprains, and other muscle injuries.  https://medlineplus.gov/druginfo/meds/a682514.html (accessed
December 13, 2018).

26    [4] Somatoform symptom disorder . . . is a form of mental illness that causes one or more bodily symptoms, including
pain.  The symptoms may or may not be traceable to a physical cause including general medical conditions, other
mental illnesses, or substance abuse.  But regardless, they cause excessive and disproportionate levels of distress.
The symptoms can involve one or more different organs and body systems such as pain, neurologic problems,
gastrointestinal complaints, and sexual symptoms.  Many people who have SSD will also have an anxiety disorder.
www.webmd.com/mental-health/somatoform-disorders-symptoms-types-treatment#1 (accessed December 13, 2018).

intracranial abnormality, no active intracranial demyelinating disease, and no significant interval changes from prior MRIs administered in 2005 and 2006.  AR 204-05.

On August 19, 2011, Christina del Toro-Diaz, M.D., examined Plaintiff.  AR 224. Plaintiff told the doctor that he was scheduled to see a neurologist in Arizona but was experiencing bone pain and muscle spasms too severe for him to wait for that appointment. Despite taking Flexeril, Plaintiff was waking during the night and sometimes tripping and falling because of muscle spasms.  On September 9, 2011, Stephen Helper, M.D., examined Plaintiff for "persistent muscle spasms of undetermined etiology."  AR 224.  The physical exam was negative. AR 224.  Dr. Helper discontinued Flexeril and prescribed baclofen.  AR 224.

From September 14-16, 2011, Plaintiff was examined at the Barrow Neurological Institute of St. Joseph's Hospital and Medical Center, Phoenix, Arizona.  AR 268-92.  In the intake interview notes, Marwan Malouf, M.D., reported that Plaintiff's symptoms began in 2007 after Plaintiff experienced a prolonged episode of amnesia during which Plaintiff was incoherent for approximately six hours.  AR 278.  Plaintiff related "multiple non-cognitive complaints, most prominently spasticity and pain that intermittently affect various muscle groups bilaterally."  AR 278.  His symptoms have precluded driving, working and attending college.  AR 278.  Plaintiff denied "spatial disorientation, impaired judgment, difficulty handling financial affairs, shopping, preparing meals, maintaining hobbies, keeping track of current events, taking medications or performing personal hygiene and dressing."  AR 278.  Dr. Malouf summarized a neurobehavioral assessment, which included standardized testing:

> Performance was normal across all cognitive domains with the exception of the 30 minute delayed recall on the CERAD word recall test of memory.  The patient remembers only 5/10 items and recognize 7/10 items, which is below expectation for his age and education.  In the absence of functional decline, the results are suggestive of mild cognitive impairment, amnestic.  The geriatric depression scale was mildly elevated and the patient has a history suggestive of depression but the patient did not exhibit any depressive symptoms during the evaluation.

AR 283.

///

Dr. Malouf diagnosed:

6

1.    Mild cognitive impairment, amnestic; the etiology is not clear at this moment and further investigations are needed; metabolic, infectious and autoimmune causes will be ruled out.

2.    Spasticity, not associated with changes on brain MRI; spinal cord involvement will be ruled out.

3.    Migraine headaches with aura.

4.    Depression, based on history and geriatric depression scale, not improved by Lexapro.

AR 283.

On September 15, 2011, a cervical, thoracic and lumbar spine MRI with and without contrast was normal.  AR 277.  On September 16, 2011, Dr. Malouf reported that all testing was normal.  AR 271-72.  The doctor ordered follow-up viral, fungal and paraneoplastic studies, recommended treatment with a psychiatrist or therapist, and encouraged Plaintiff to remain active.  AR 272.

On April 6, 2012, Dr. Helper noted that Plaintiff continued to complain of stabbing pain in his bones, but that the physical exam was "essentially negative."  AR 223.  Dr. Helper referred Plaintiff to rheumatology.  AR 223.

On June 7, 2012, Plaintiff was examined by neurologist Aimee Pierce, M.D., at University of California-Irvine Health Care.  AR 234.  Tests of Plaintiff were generally normal.  AR 234. Dr. Pierce recommended acupuncture for pain relief.  AR 234.  On July 5, 2012, Plaintiff complained of recent severe insomnia and mood swings between depression and elation.  AR 233.

On August 21, 2012, Dr. Pierce referred to Plaintiff's condition as "fibromyalgia, multiple neuro and pain complaints."  AR 254.  Plaintiff found acupuncture relaxing and experienced reduced depression since beginning Pamelor.  AR 254.  However, Plaintiff had developed transient paraethesias.  AR 254.  Plaintiff reported no pain on the ambulatory self-reporting pain tool.  AR 253.

In November 2012, Plaintiff told Dr. Pierce that he continued to experience joint pain and muscle spasms.  AR 252.  He rated his pain 6/10 on the self-reporting pain tool.  AR 251.  He had stopped doing acupuncture.  AR 252.

On December 10, 2012, Dr. Pierce prescribed Tylenol 3[5] after Plaintiff called to report severe muscle and bone pains and spasms. AR 250. He had great improvement by his December 13, 2012, appointment. AR 250.

On December 27, 2012, Leslie Burson, D.O., treated Plaintiff for chest pain in the emergency department of Bakersfield Memorial Hospital. AR 246-47. Plaintiff described sharp pain which had lasted for two days, which increased with movement or palpation. AR 246. Dr. Burson's examination did not suggest any acute cardiac or pulmonary injury. AR 246. Plaintiff told Dr. Burson that he had Tylenol with codeine at home for treatment of fibromyalgia and that he preferred to take it for the pain; however, before coming to the emergency department he had been using Naproxen. AR 246. At the urging of his family, Plaintiff took Toradol, which mildly improved his condition. AR 246.

On March 18, 2013, Plaintiff told Dr. Pierce that he was having hand and wrist pain on occasion. AR 249. He reported that he was swimming and jogging and denied recent anxiety, depression, or migraine headaches. AR 249. Nonetheless, his pain and pain memory limited his ability to do work. AR 249.

On April 22, 2014, Dr. Pierce noted that Plaintiff's neurological symptoms were either stable or had improved since he began treatment. AR 747. Nonetheless, muscle spasms and chronic pain with fibromyalgia continued to impair Plaintiff's daily activities. AR 747.

On October 20, 2014, Plaintiff saw Dr. Pierce and complained that his joint pain and muscle spasms were worsening. AR 587. He was experiencing severe fatigue, right hamstring pain, and bilateral pain in his calves and lower back. AR 587. Plaintiff reported that he was riding an exercise bicycle for 30 minutes twice a week. AR 587. Dr. Pierce noted an unremarkable neuro exam, increased his gabapentin prescription, and encouraged Plaintiff to continue taking his medication and getting light exercise. AR 587.

On October 9, 2015, Plaintiff told Dr. Pierce that the increased gabapentin had not helped his pain, which continued to worsen. AR 618. He complained of bilateral knee and hip pain,

---

[5] Tylenol 3 is a combination of acetaminophen and codeine. https://medlineplus/gov/druginfo/meds/a601005.html (accessed December 13, 2018).

which was worse on the right, and of hand and wrist pain. AR 618. Dr. Pierce noted no joint

redness or swelling. AR 618. Although Baclofen generally controlled his muscle spasms,

Plaintiff recently had one muscle spasm which caused him to fall down. AR 618. He was

walking with a cane. AR 618. Plaintiff could no longer exercise due to pain. AR 618. His

memory was worse and he forgot conversations. AR 618. His fatigue continued. AR 618. Dr.

Pierce attributed Plaintiff's symptoms to fibromyalgia. AR 619. Since gabapentin did not relieve

Plaintiff's pain, she directed Plaintiff to taper off it. AR 620. The doctor adjusted Plaintiff's

other prescriptions and ordered testing. AR 620. She encouraged exercise as tolerated. AR 620.

X-rays of Plaintiff's knees and hips taken December 4, 2015 revealed no diagnostic

abnormality. AR 630-32.

When Plaintiff saw Dr. Pierce for a follow-up appointment on April 8, 2016, he reported

little change in his symptoms. AR 733-35. Plaintiff was exercising once weekly for thirty

minutes on a stationary bicycle. AR 733. He continued to feel forgetful and spaced out. AR 733.

Dr. Pierce stated that Plaintiff's chronic pain was "most likely due to fibromyalgia." AR 735.

**IV.** **Standard of Review**

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

Commissioner denying a claimant disability benefits. "This court may set aside the

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

legal error or are not supported by substantial evidence in the record as a whole." *Tackett v.*

*Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence

within the record that could lead a reasonable mind to accept a conclusion regarding disability

status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less

than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

omitted). When performing this analysis, the court must "consider the entire record as a whole

and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v.*

*Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

omitted). If the evidence reasonably could support two conclusions, the court "may not substitute

///

its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

**V.      The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).

**VI.      Summary of the ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ who conducted the remand hearing determined that Plaintiff did not meet the disability standard.  AR 303-11.  The ALJ found that Plaintiff worked after the alleged onset date of December 31, 2010, but declined to determine whether the work constituted substantial gainful

activity in light of her decision denying disability benefits. AR 305. Plaintiff had a single serious impairment, fibromyalgia, which did not meet or medically equal in severity any listed impairment. AR 306-07. The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could only occasionally climb, balance, kneel, crouch and crawl. AR 307. Plaintiff was capable of performing his past relevant work as a guide and fast food worker. AR 310. Accordingly, the ALJ found that Plaintiff was not disabled. AR 311.

**VII.** **Plaintiff's Credibility**

Plaintiff contends that the ALJ erred in finding that Plaintiff's testimony lacked credibility without providing clear and convincing reasons for her finding. The Commissioner responds that the ALJ properly discounted Plaintiff's testimony of disabling pain and other symptoms as inconsistent with both his activities of daily living and the medical evidence.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by specific, cogent reasons. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). To determine whether the ALJ's findings are supported by substantial evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 308. The ALJ did not find Plaintiff to be malingering.

///

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his symptoms only if he makes specific findings that include clear and convincing reasons for doing so. *Garrison*, 759 F.3d at 1014-15; *Smolen*, 80 F.3d at 1281. "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). *See also* Social Security Ruling ("SSR") 96-7p[6] (stating that an ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight"). It is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1991).

In assessing the claimant's credibility, the ALJ may use "ordinary techniques of credibility evaluation," considering factors such as a lack of cooperation during consultative examinations, a tendency to exaggerate, inconsistent statements, an unexplained failure to seek

_____

[6] Social Security Ruling 96-7p was superseded by Ruling 16-3p, effective March 28, 2016. See 2016 WL 1020935, *1 (March 16, 2016); 2016 WL 1131509, *1 (March 24, 2016) (correcting SSR 16-3p effective date to March 28, 2016); 2017 WL 5180304, *2 (Oct. 25, 2017) (further correcting SSR 16-3p). Although the second step has previously been termed a credibility determination, recently the Social Security Administration ("SSA") announced that it would no longer assess the "credibility" of an applicant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." See SSR 16-3p, 2016 WL 1020935 at *1 ("We are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."). Social Security Rulings reflect the SSA's official interpretation of pertinent statutes, regulations, and policies. 20 C.F.R. § 402.35(b)(1). Although they "do not carry the force of law," Social Security Rulings "are binding on all components of the [SSA]" and are entitled to deference if they are "consistent with the Social Security Act and regulations." 20 C.F.R. § 402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) (citations and quotation marks omitted).

As the Ninth Circuit recently acknowledged, SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (Posner, J.) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.") In this case, SSR 16-3p became effective before the hearing of the consolidated cases on remand and the issuance of the second hearing decision. When a federal court reviews the final decision in a claim, the district court is to apply the rules in effect when the decision was issued by the agency. SSR 16-3p, 2017 WL 5180304 at *1 (Oct. 25, 2017). Accordingly, Ruling 16-3p does not apply in this case.

treatment, inconsistencies between the testimony and conduct, and inconsistencies between daily activities and the alleged symptoms." *Tonapetyan v. Halter,* 242 F.3d 242 F.3d1144, 1146; *see also Smolen*, 80 F.3d at 1284; *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (including as factors claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, work record, and testimony from physicians and third parties about the nature, severity, and effect of the alleged disabling symptoms). "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958. "[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." *Bunnell*, 947 F.2d at 346. On the other hand, if the ALJ's credibility finding is supported by substantial evidence in the record, courts "may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

Using Defendant's boilerplate language, the ALJ wrote that Plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible for the reasons explained in the decision." AR 308. The ALJ explained that she had based her determination of Plaintiff's residual functional capacity on Plaintiff's subjective reports of muscle spasm, memory loss, headaches, insomnia, blurred vision, occasional dizziness, chronic joint pain and stiffness, fatigue, olfactory hallucinations, heat intolerance, and transient paresthesias; however, treatment notes, objective diagnostic studies, clinical findings, treating source opinion, examining source opinions, and claimant's activities weighed strongly against her finding a more restrictive residual functional capacity. AR 308. In support of her assessment of the objective medical evidence, the ALJ referred to her detailed discussion of the medical opinions, contained in the record at AR 308-10 (more fully discussed in section VIII of this order). AR 308. She wrote:

> Contrary to a debilitating condition, the claimant has received conservative treatment along with intermittent neurological evaluations. Despite the claimant's multiple neurologic complaints, objective diagnostic workup revealed no significant abnormalities and treating and examining sources were unable to formulate a

13

definitive diagnosis concerning his complaints. The claimant's examining and treating sources noted that his symptoms were most likely due to fibromyalgia.

AR 308 (citations to record omitted).

The ALJ then proceeded in her detailed examination of the medical evidence. AR 308-10. In the course of her discussion, the ALJ contrasted Plaintiff's claims with evidence in the record of his day-to-day functioning:

Contrary to the claimant's alleged symptoms and limitations, he was able to work, volunteer, go to school, ride an exercise bike and drive. Dr. Pierce encouraged the claimant to perform exercise as tolerated. During the May 2016 exercise treadmill test, the claimant exercised for 9 minutes and 49 seconds on a regular Bruce protocol, achieving a maximum heart rate of 170.

AR 309 (citations to record omitted).

Considered in light of the record as a whole, the Court finds that the ALJ's analysis sets forth clear and convincing reasons for the conclusions she reached.

Plaintiff further contends that since fibromyalgia is diagnosed by Plaintiff's subjective pain reports, the ALJ erred in rejecting his depictions of his pain as less than credible. Plaintiff is wrong. An ALJ may reject symptom testimony that is contradicted by, or inconsistent with, the record; and, as long as other reasons are provided, can also reject those that lack the support of objective medical evidence. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008)(holding that the ALJ did not err in rejecting Carmickle's testimony that he could lift ten pounds occasionally in favor of a physician's opinion that Carmickle could lift ten pounds frequently); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1148.

Medications, treatments, and other methods used to alleviate symptoms are "an important indicator of the intensity and persistence" of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.1529(c)(3); SSR 16-3p. For example, an ALJ may consider unexplained or inadequately explained failure to seek or follow through with treatment, *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); the use of conservative treatment, *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007); and any other factors concerning functional limitations and

14

restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(vii), 416.1529(c)(3)(vii). The ALJ's credibility analysis appropriately considered both the conservative treatment provided to Plaintiff and the recommendation repeated throughout the record that Plaintiff exercise as he was able since stretching and exercise would help relieve his discomfort.[7]

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollin*, 261 F.3d at 857; SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly considers whether the medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence").

In short, a claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p, 2017 WL 5180304 (Oct. 25, 2017). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The standard of review limits a district court's discretion on challenges to the ALJ's adverse credibility determinations. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson*, 402 U.S. at 401. If the evidence could

---

[7] Here, the ALJ would have had good reason to question the sincerity of Plaintiff's commitment to following through with doctors' exercise recommendations. For instance, he testified that he did not participate in the full yoga classes, stopping his participation when the positions became challenging. In addition, he reported to his physician that he discontinued regular use of an exercise bicycle when he moved to an apartment that did not offer a convenient exercise room.

reasonably support either outcome, a court may not substitute its judgment for that of the ALJ. *Flaten v. Sec'y, Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

The Court will not second guess the ALJ's assessment of Plaintiff's credibility in this case.

**VIII.    The ALJ's Evaluation of Dr. Pierce's Residual Functional Capacity Opinion**

Plaintiff challenges the Commissioner's determination of his residual functional capacity, contending that the ALJ erred in giving little weight to the opinions of treating neurologist Aimee Pierce, M.D.  Doc. 16 at 3-4.  Plaintiff maintains that acknowledgement of Plaintiff's reported symptoms in multiple physicians' notes serves to provide sufficient objective medical evidence to support Dr. Pierce's opinion of Plaintiff's residual functional capacity.  Doc. 16 at 4-6.  Finally, as he does in his challenge to the ALJ's assessment of claimant credibility, Plaintiff argues that the ALJ erred in considering conservative treatment, the recommendation that Plaintiff exercise, and Plaintiff's daily activities as weighing against Dr. Pierce's opinion.  Doc. 16 at 7-8.  The Commissioner disagrees contending that the ALJ properly rejected Dr. Pierce's very restrictive opinion as inconsistent with the medical record, the recommendation that Plaintiff exercise, and conservative treatment.  Doc. 17 at 8-9.  The Court finds that the ALJ properly relied on the record as a whole.

**A.    Medical Opinions**

**1.    Agency Physicians**

On December 3, 2012, agency physician R. Tashjian, M.D., found no medically determinable mental impairments.  AR 59, 69.  Accordingly, on its initial review, the agency determined that Plaintiff had no established diagnosis.  AR 71.

On October 28, 2015, agency psychologist Kim Morris, Ph.D., agreed with the first ALJ's assessment that no objective medical findings supported Plaintiff's psychological allegations, and any mental impairments were not severe.  AR 371-72.  On February 22, 2016, agency physician D. Tayloe, M.D., concluded that Plaintiff's allegations of physical impairments were not supported by objective medical evidence and were less than fully credible.  AR 416.  Dr. Tayloe concluded that Plaintiff had no exertional or non-exertional limitations.  AR 416.  On February

23, 2016, psychologist D. Lam, Ph.D., agreed with Dr. Morris's assessment. AR 415. Finding no evidence that Plaintiff's physical or mental condition had changed since his 2013 application, the agency applied *Chavez v. Owen*, and found that Plaintiff was not disabled. AR 417.

### 2. Consultative Neurological Examination

In or about November 2012, neurologist B.S. Subhas, M.D., performed a consultative examination for the agency. AR 236-39. Dr. Subhas diagnosed a history of migraine headaches (stable), a history of spasms of undetermined nature or cause, and possible depression. AR 238. The doctor wrote:

> From the clinical examination, it is rather difficult to ascertain the limitations in view of the randomness of his symptoms. Currently, no definitive neurological pathology or other diagnosis would be made as at present [*sic*]. His cognitive abilities are intact and he is able to perform in a sitting position in the full time. The rapid alternative movement capabilities are also intact and so is his ambulation. He probably is somewhat limited as a precautionary measure to be working around moving machines or at unprotected heights. As mentioned before[,] definitive limitation cannot be delineated in view of the randomness of his symptoms which are once again are difficult to be defined.

> A psychological or psychiatric evaluation may be of some benefit.

AR 238.

### 3. Consultative Psychological Examination

On November 15, 2012, clinical psychologist Charlene K. Krieg, Ph.D., performed a consultative psychological examination for the state agency. AR 240-44. The interview and testing results were within normal limits, and Dr. Krieg made no psychological diagnosis. She summarized:

> The claimant did not evidence any disorder on mental status. His speech was understandable. His mannerisms were socially appropriate. His eye contact and interaction with the examiner were appropriate. He was cooperative and appeared to be putting forth his best effort. He reported getting along with family and friends. He appears able to manage benefits on his own at the present time.

> The claimant's current level of intellectual functioning is in the average range. His performance on attention/concentration tasks that require the manipulation of complex information is in the average range.

> Considering his overall presentation and performance, there is no mental impairment that would limit his ability to engage in work activities and complete a normal workday or workweek. He appears able to deal with the usual stress that may be encountered in competitive work and adjust to changes. He would not create a hazard in the workplace. He would be capable of performing simple/repetitive and detailed/complex work tasks.

AR 243-44.

### 4.     **Medical Source Statement (Dr. Pierce)**

In a medical source statement dated July 15, 2013, Dr. Pierce diagnosed Plaintiff with fibromyalgia and migraines with guarded prognosis. AR 258-60. Plaintiff's symptoms included neuropathic pain, spasticity, insomnia, difficulty walking, migraine, fatigue, vertigo, tremor and cognitive impairment. AR 258. He had slow, wobbly gait and impaired tandem gait. AR 258. He required a cane or other assistive device. AR 259.

Dr. Pierce opined that Plaintiff could sit one hour at a time before needing to get up and stand for ten minutes before needing to sit or walk around. AR 258. He could sit about four hours and stand less than two hours in an eight-hour work day, and must be able to change position at will. AR 258-59. Approximately every two hours, Plaintiff might need an unscheduled break to lie down. AR 259.

Plaintiff could rarely lift twenty pounds, occasionally lift ten pounds, and frequently lift less than ten pounds. AR 259. He could rarely twist, stoop, balance, or kneel and occasionally crouch or climb ladders or stairs. AR 259. Plaintiff could rarely handle, finger, reach in front of his body, or reach overhead. AR 260. He was likely to be off task fifteen per cent of the time and absent from work three days monthly. AR 260. Visual-communicative impairments included disorientation and impaired word recall. AR 260. Excessive heat greatly exacerbated Plaintiff's symptoms. AR 260.

### 5.     **Psychological Source Statement ( Dr. Crouch)**

On October 14, 2013, therapist Steven R. Crouch, LMFT, completed a medical source statement of ability to do work-related activities (mental).[8] AR 262-65. Crouch opined that

---

[8] No evidence in the record establishes that Dr. Crouch examined or treated Plaintiff. *See* AR 262 (date of first appointment is left blank).

Plaintiff "is unable to work due to his current psychological issues of depressed mood and memory." AR 265. He diagnosed Plaintiff:

| | | |
|---|---|---|
| Axis I | 293.83 | Major depression due to a general medical condition. |
| | 293.84 | Anxiety disorder due to medical condition. |
| | 799.59 | Unspecified neurocognitive disorder. |
| Axis II | V62.9 | Unspecified problem related to social environment. |
| Axis III | | Memory problem related to neurological condition, pain related to autoimmune disease, difficulty concentrating due to neurological condition, seizure disorder. |
| Axis V | | Current GAF 40. |

AR 265.[9]

Crouch opined that Plaintiff would be unable to respond appropriately to changes in work setting and would experience difficulties with restrictions of daily living about five per cent of the workday. AR 263. About ten per cent of the workday Plaintiff would be unable to maintain attention and concentration for extended periods of time and sustain an ordinary routine without special supervision, and would experience difficulties in maintaining concentration, persistence and pace. AR 262-63. About fifteen percent of the workday, Plaintiff would be unable to understand, remember and carry out short and simple instructions; understand, remember and carry out detailed instructions; perform activities within a schedule, maintain regular attendance and be punctual and within customary tolerances; and complete a normal workday and work week. AR 262. Plaintiff would likely be absent from work two days per month. AR 264.

///

///

---

[9] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 31- 40 corresponds to some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id*.

### 6. Consultative Neurologic Evaluation (Dr. McMurtray)

On October 10, 2015, neurologist Aaron McMurtray, M.D., conducted a consultative examination for the state agency. AR 624-28. The physical examination of Plaintiff was generally within normal limits. *See* AR 626-28. Dr. McMurtray opined:

> The claimant has very minimal findings on physical examination today and in general can walk without a limp or the use of an assistive device. I did not find any evidence on physical examination to support a diagnosis of fibromyalgia.

AR 628.

Accordingly, Dr. McMurtray found that Plaintiff had no limitation on standing, walking, sitting, lifting or carrying. AR 628. Plaintiff had no postural limitations, no manipulative limitations, and no workplace environmental limitations. AR 628.

### B. Applicable Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester*, 81 F.3d at 830. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Such independent reasons may include laboratory test results or contrary reports from

///

examining physicians and Plaintiff's testimony when it conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831, citing *Magallanes*, 881 F.2d at 755.

### C.   The ALJ's Determination is Specific, Legitimate and Based on the Record as a Whole

The ALJ gave little weight to the opinions of the non-examining agency physicians who opined that Plaintiff did not have a serious impairment. AR 310. She gave little weight to the severity opinions expressed by Drs. Subhas and McMurtray, but noted that their clinical findings supported her assessment of Plaintiff's residual functional capacity. AR 310. She gave significant weight to Dr. Kreig's opinion "because [s]he had the opportunity to examine the claimant and clinical findings support h[er] opinion." AR 310.

With certain exceptions, the ALJ gave significant weight to the opinions of Plaintiff's treating sources. AR 310. She gave little weight to Dr. Pierce's March 2013 medical source statement because (1) the clinical findings did not support the expressed limitations; (2) Plaintiff received scant follow-up treatment; (3) she encouraged Plaintiff to exercise; (4) she did not offer a definitive diagnosis concerning Plaintiff's symptoms; and (5) Plaintiff's activities contradicted her opinion. AR 310. The ALJ elaborated:

> [C]ontrary to the . . . medical source statement, the claimant has had limited follow-up treatment for fibromyalgia. In October 2014, Dr. Pierce recommended that the claimant should continue to perform light exercise, The claimant followed up with Dr. Pierce in October 2015, and upon examination, Dr. Pierce noted that he was in no apparent distress, he was awake and alert, his speech was fluid and prosaic, his shoulder shrug and head turn were 5/5 bilaterally, he had 5/5 motor strength and intact fine finger movements bilaterally, and ambulated with a cane,  Dr. Pierce ordered additional diagnostic workup and completed the claimant's federal student loan discharge application for total and permanent disability. As previously discussed, the subsequent diagnostic workup was negative.

AR 309.

Finally, the ALJ concluded that treatment notes, objective diagnostic studies, clinical findings, opinions of treating and examining sources, and Plaintiff's activities all supported the finding that Plaintiff was capable of light work with the exception that Plaintiff was capable of occasionally climbing, balancing, kneeling, crouching, and crawling. AR 307, 310.

Plaintiff counters the ALJ's opinions with evidence drawn from the record in support of his claimed disability. His analysis and preferred outcome are not controlling here.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The Court is not required to accept Plaintiff's characterization of his treatment records. Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well. When the evidence could arguable support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

## IX. Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Tristan Kasinger.

IT IS SO ORDERED.

Dated:   **December 20, 2018**                      **/s/ Gary S. Austin**
                                                   UNITED STATES MAGISTRATE JUDGE